UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division



JEDENE RANDOLPH ROOKS,

      Petitioner,

v.

      Criminal No.: 4:07cr142
      Civil No.: 4:11cv144

UNITED STATES OF AMERICA,

      Respondent.

## OPINION AND ORDER

This matter is before the Court on Petitioner Jedene Randolph Rooks's ("Petitioner") Motion to Vacate, Set Aside, or Correct Sentence, filed pursuant to 28 U.S.C. § 2255. Petitioner's § 2255 motion alleges that his counsel was ineffective for: (1) failing to object to certain testimony; (2) failing to object to alleged prosecutorial misconduct at trial; and (3) failing to object to certain alleged errors by the Court. The Court finds that an evidentiary hearing is unnecessary because the record conclusively demonstrates that Petitioner is not entitled to the relief sought in his § 2255 motion. See R. Governing § 2255 Proceedings in U.S. Dist. Cts. 8(a). For the reasons discussed below, Petitioner's § 2255 motion is **DENIED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On October 24, 2007, a grand jury in Norfolk returned an Indictment against Petitioner, charging him with one count of Possession with Intent to Distribute Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).   The Indictment alleged that Petitioner was found in possession of more than five grams of cocaine base during a traffic stop in 2006.   Before trial, this Court considered and denied Petitioner's motions to suppress evidence seized at the traffic stop and evidence of Petitioner's prior convictions.

Petitioner's first jury trial commenced before United States District Judge Robert G. Doumar on January 24, 2008.   The Government presented testimony of the two police officers who conducted the traffic stop.   Officer Nunez testified that Petitioner was a passenger in a vehicle with a cracked windshield.   Officer Nunez and Officer Morris stopped the vehicle and, as Petitioner walked to the back of the vehicle, he began to run away from the vehicle.   Officer Nunez testified that, as Petitioner ran away, he pulled a plastic bag from his waistband and threw it on the ground.   The officer picked up the bag and observed what he believed to be cocaine inside the bag. See Trial Excerpt Tr. at 16 (Jan. 24-25, 2008).   Officer Nunez placed the plastic bag inside his uniform shirt and continued chasing Petitioner.   Id. at 39.   Officer Morris, the other

officer present at the stop, testified that, when Officer Nunez returned from chasing Petitioner, he had a bag of suspected narcotics in his hand.   Officer Nunez handed the bag to Officer Morris, who photographed, weighed, and conducted field tests on the bag's contents before logging the bag and its contents into inventory.   Id. at 54-57.   During closing argument, defense counsel observed:

> Also, there's no fingerprint evidence in this case. There's no DNA evidence in this case linking the drugs, the packaging to [Petitioner] at all.   No one else we know saw [Petitioner] supposedly throw this bag of drugs.   And I think you can ask yourself why the police didn't at least bother to try to get fingerprint evidence here, try to get DNA evidence here.   At least make the attempt.

Closing Statement Tr. at 23 (Jan. 24-25, 2008).   In rebuttal, the Government responded, "DNA and fingerprints.   Why would we need that?   We have an eyewitness who saw him throw this bag of drugs.   Not necessary.   So why would the Commonwealth of Virginia use your tax dollars to go through the expense of that?"   Id. at 29.   During jury deliberations, the jury sent a note to the Court, asking why the bag containing the cocaine was not tested for fingerprints and DNA.   The Court instructed the jury to consider only the evidence before them.   When the jurors informed the Court that they could not reach a unanimous decision, the Court declared a mistrial.

Petitioner's second trial began before United States District Judge Jerome B. Friedman of this Court on March 18,

3

2008.[1]   Officers Nunez and Morris again testified regarding the traffic stop, the chase, and the recovery of the plastic bag containing the narcotics.   This time, however, Officer Nunez described in greater detail his handling of the bag after returning from the chase, stating, "I gave Officer Morris the plastic bag, the plastic bag containing the suspected cocaine. I was tired, I was sweating, out of breath, and I gave him the bag of cocaine for field test purpose."   Trial Tr. at 60.   He testified that Officer Morris was not wearing gloves when he took the bag and opened it for counting and field testing.   The prosecutor asked Officer Nunez why he did not submit the bag for fingerprint or DNA analysis.   Officer Nunez replied, "I handled the plastic bag. . . . I picked it up.   I was looking at it, put it inside my shirt.   I ran with it.   After that, Officer Morris handled the plastic bag."   Id. at 65.   Officer Nunez continued, "[s]o my belief was that the fingerprints would only be my fingerprints or Officer Morris' fingerprints."   Id.   The prosecutor also asked Officer Morris, "why weren't fingerprints or DNA tests done on these items?"   Officer Morris testified that Officer Nunez "indicated that the items never lost sight from the moment that [Petitioner] . . . tossed the items back. . . .   Therefore, these items would not be needed to be

---

[1] Judge Doumar recused himself from the second trial on a motion by Petitioner pursuant to 21 U.S.C. § 455, and this case was reassigned to Judge Friedman.   Judge Friedman retired from the Court on August 19, 2011, and this matter was assigned to the undersigned.

4

fingerprinted due to the officer not losing sight of the items."
Id. at 110.

On cross-examination of Officer Nunez, defense counsel asked "why [the officer] didn't bother to submit this evidence for fingerprint testing." Id. at 88. Counsel opined that the officer "could have advised whoever is at the lab, that [his] prints may be on this bag." Id. at 89. The officer explained that it "never went through [his] mind" because it was not a situation such as where "three people [were] in the car and . . . nobody wants to confess to or who did the narcotics belong to." Id. In such cases, Officer Nunez testified, he "would go to the lab and say, okay, this is the narcotics. I would send them to the state lab." Id. On cross-examination of Officer Morris, defense counsel confirmed that Officer Morris "had gloves on" when he "field tested the suspected drugs." Id. at 118.

After both officers testified, the Government called an expert witness, the supervisor of the forensic DNA biology section of the Virginia Department of Forensic Science. The witness testified that "the success rate for analyzing touch evidence" - evidence that has come in contact with a person's hand - is "a low success rate." Trial Tr. at 126 (vol 1. Mar. 18, 2008). The witness explained that the success rate depended on several factors, including the number of people handling the

evidence and each handler's number of skin cells or body fluids. Id. at 127-28.   The witness also described the department's written "touch evidence policy" in cases not involving violence or major crimes.   Id. at 128.   According to the witness, the policy requires a prosecutor to submit a written request asserting that "they need [the testing]" because "DNA might be able to tell them something they don't already know."   Id.   The witness also testified that "the cost for a DNA test" is between $500 and $1000 per sample, not including court costs.   Id. at 129-30.   On cross-examination, the expert witness testified that, despite the department's policy, DNA analysis could have been conducted on the bag and that the bag could possibly have revealed DNA evidence, depending on the factors described during direct examination.   Id. at 132-136.

The Government also called as an expert witness the supervisor of the fingerprint section of the Virginia Department of Forensic Science.   That witness testified that the "success rate" for obtaining fingerprints from "plastic bags with cocaine is probably less than 3 percent."   Id. at 174.   He also explained that, since 1994, the lab's policy prevented them from analyzing "small little plastic bags" because "the surface area was so small that the [fingerprint] ridge detail couldn't even be determined."   Id. at 175.   Even with a larger bag, such as the one recovered during the traffic stop, the supervisor

explained that several "factors can deter any fingerprint development," such as "environmental factors," "being handled by somebody else," the "transfer medium, [the] perspiration, and . . . the surface area." Id. at 177. The witness then demonstrated for the jury how easily a fingerprint could be wiped away from a plastic bag. Id. at 178.

In closing argument, defense counsel again addressed the absence of forensic evidence linking Petitioner to the bag of narcotics: "There is no fingerprint evidence in this case. There is no DNA evidence in this case. I understand the policies of the lab. . . . But they didn't even try. Maybe they would have found something, maybe not. But if you have someone's liberty at stake, at least try, at least try to get some corroborating evidence. Clearly they didn't do anything to try to corroborate Officer Nunez's testimony; nothing." Id. at 246-47. The jury convicted Petitioner of the single count alleged in the Indictment.

Petitioner filed a post-judgment motion of acquittal, which the Court denied on March 28, 2008 and, on June 23, 2008, the Court sentenced Petitioner to 360 months of incarceration and eight years of supervised release. 21 U.S.C. § 841(b)(1)(B) called for a baseline sentence of between five and forty years. Because of Petitioner's prior drug convictions, the statutory range was increased to between ten years and life imprisonment.

Petitioner's classification as a career offender further raised his sentencing range to between 360 months and life.

The United States Court of Appeals for the Fourth Circuit denied Petitioner's direct appeal on February 25, 2010, United States v. Rooks, 596 F.3d 204 (4th Cir. 2010), and the Supreme Court denied certiorari on October 4, 2010, Rooks v. United States, No. 09-11153, 2010 U.S. LEXIS 6539 (Oct. 4, 2010). Petitioner filed the present Motion to Vacate, Set Aside, or Correct Sentence, accompanied by a supportive memorandum, on October 3, 2011, and on March 21, 2012, the government filed its response. Accordingly, this matter is ripe for review.

## II.   STANDARD OF REVIEW FOR § 2255 MOTION

A federal prisoner, in custody, may collaterally attack his sentence or conviction by moving the district court "to vacate, set aside or correct the sentence." 28 U.S.C. § 2255. To obtain such relief, a petitioner bears the burden of proving that his sentence or conviction was "imposed in violation of the Constitution or laws of the United States," that the district court "was without jurisdiction to impose such sentence," that the sentence exceeds "the maximum authorized by law," or that the sentence or conviction is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A petitioner must prove the asserted grounds for relief by a preponderance of the evidence. Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958).

Because a § 2255 motion "is ordinarily presented to the judge who presided at the original conviction and sentencing . . . the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . ." Blackledge v. Allison, 431 U.S. 63, 74 n.4 (1977).

A § 2255 motion is, in essence, a statutory federal habeas corpus action that collaterally attacks a sentence or conviction through the filing of a new proceeding, as contrasted with a direct appeal. See In re Jones, 226 F.3d 328, 333 (4th Cir. 2000) ("'[Section] 2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus.'" (quoting Davis v. United States, 417 U.S. 333, 343 (1974))). The existence of the right to pursue a collateral attack does not displace a direct appeal as the "usual and customary method of correcting trial errors." United States v. Allgood, 48 F. Supp. 2d 554, 558 (E.D. Va. 1999). On the contrary, with limited exceptions, a petitioner advancing new claims asserted for the first time in a § 2255 motion "must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1981). Accordingly, a § 2255 collateral challenge "may not do service for an appeal." Id. at 165.

The "higher hurdle" that applies to claims advanced for the first time in a § 2255 action exists because, once a defendant's

opportunity to pursue a direct appeal has been waived or exhausted, there is "a final judgment [that] commands respect." Id. at 164-65. Accordingly, the doctrine of procedural default generally prevents a district court from reaching the merits of § 2255 claims that were not raised on direct appeal unless a petitioner can show: (1) "cause" excusing the failure to directly appeal such alleged errors; and (2) "actual prejudice resulting from the errors of which he complains." United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1992). "'The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel.'" United States v. Pettiford, 612 F.3d 270, 280 (4th Cir. 2010) (quoting Mikalajunas, 186 F.3d at 493). As for prejudice, it is not enough for a petitioner to demonstrate "a possibility of prejudice," but rather he must show that the claimed errors "worked to his actual and substantial disadvantage, infecting his entire [case] with error of constitutional dimensions." Frady, 456 U.S. at 170.

A § 2255 petitioner need not overcome the procedural default bar to advance a freestanding claim of ineffective assistance of counsel, which is properly asserted for the first time in a § 2255 motion. See United States v. King, 119 F.3d 290, 295 (4th Cir. 1997) ("[I]t is well settled that 'a claim of

10

ineffective assistance should be raised in a 28 U.S.C. § 2255 motion in the district court rather than on direct appeal, unless the record conclusively shows ineffective assistance.'" (quoting United States v. Williams, 977 F.2d 866, 871 (4th Cir. 1992))). Such rule exists because the Federal Rules Governing § 2255 Proceedings permit expansion of the record, which is generally unavailable on direct appeal and often necessary to properly resolve an ineffective assistance claim. United States v. Baptiste, 596 F.3d 214, 216 n.1 (4th Cir. 2010); see United States v. Allen, 491 F.3d 178, 191 (4th Cir. 2007) (indicating that ineffective assistance of counsel claims "are normally raised before the district court via 28 U.S.C. § 2255").

The Sixth Amendment to the Constitution of the United States provides that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The United States Supreme Court has interpreted the right to counsel as providing a defendant with "'the right to the effective assistance of counsel.'" Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)) (emphasis added). To obtain relief based on an allegation of ineffective assistance, a petitioner must establish both that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's inadequate performance caused the petitioner

11

prejudice.   Id. at 687-88.   "[U]nsubstantiated and largely conclusory statements" are insufficient to carry a petitioner's burden as to the two prongs of the Strickland test.   United States v. Turcotte, 405 F.3d 515, 537 (7th Cir. 2005).

When evaluating counsel's performance under the first prong of Strickland, courts "must be highly deferential."   Id. at 689; see Kimmelman v. Morrison, 477 U.S. 365, 381-82 (1986) (discussing the "highly demanding" Strickland standard).   To establish constitutionally deficient performance, a petitioner must demonstrate that his lawyer "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   Strickland, 466 U.S. at 687. Such a showing must go beyond establishing that counsel's performance was below average, since "effective representation is not synonymous with errorless representation."   Springer v. Collins, 586 F.2d 329, 332 (4th Cir. 1978); see Strickland, 466 U.S. at 687.   As it is all too easy to challenge an act, omission, or strategy, once it has proven unsuccessful, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."   Strickland, 466 U.S. at 689.   Courts should therefore "indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance." Id.

In conducting a hindsight evaluation of counsel's performance, a court must recognize that there "are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id. If defense counsel has made an adequate investigation into the facts and potential lines of defenses, "the strategic choices made as a result will seldom if ever be found wanting." Id. at 681 (internal quotation marks omitted). Accordingly, the difficulty in overcoming the general presumption that defense counsel provided effective assistance is even greater where counsel's actions required a strategic "assessment and balancing of perceived benefits against perceived risks" — such strategic decisions must be afforded "'enormous deference.'" United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004) (quoting United States v. Kozinski, 16 F.3d 795, 813 (7th Cir. 1994)).

The second prong of Strickland requires a petitioner to "affirmatively prove prejudice," which requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 693-94. "A reasonable probability is a probability sufficient to undermine confidence

in the outcome." Id. at 694. The Court applies a slightly modified prejudice standard when a petitioner alleges ineffective assistance associated with the entry of a guilty plea, requiring the petitioner to demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). If the Petitioner fails to prove either of the two prongs of the Strickland test, the Court need not evaluate the other prong of the test. United States v. Roane, 378 F.3d 382, 404 (4th Cir. 2004).

### III. DISCUSSION

Petitioner's § 2255 motion advances four claims, three of which allege that his trial counsel provided ineffective assistance and one of which alleges that his appellate counsel provided ineffective assistance. For the reasons discussed below, Petitioner fails to satisfy his burden as to all of his claims for relief under § 2255.

### A. Failure to Object to Certain Testimony

Petitioner asserts that the Government's efforts to explain law enforcement's "failure to analyze drugs for fingerprints and DNA" was "in no way relevant to proving" whether Petitioner possessed the drugs. Pet'r's Br. at 3-4. Petitioner goes on to allege that his counsel's failure to object, to the Government's

14

efforts to explain the absence of fingerprints and DNA, deprived him of "his due process[] rights to a fair trial." Id. Petitioner's first claim in his § 2255 motion thus alleges that his counsel was ineffective for (1) "fail[ing] to challenge the testimony of fingerprint and DNA experts, which failed to meet the relevance requirement set out in Fed. R. Evid. 702 and Daubert's two part test;" (2) "fail[ing] to object [to] . . . testimony from [the officers] concerning why drugs were not submitted for fingerprint[s] or DNA;" and (3) "failing to object when the Government vouched the credibility of its primary witness (Officer Nunez), through the testimony of Officer Morris." Pet'r's Mot. at 5.

### Fingerprint and DNA Expert Testimony

Petitioner concedes that "the lack of fingerprint and DNA evidence is a relevant fact under Fed. R. Evid. 401," Pet'r's Br. at 5, but argues that the expert testimony "failed to meet Fed. R. Evid. 702's standards for the admissibility of expert testimony," id. at 4. Furthermore, Petitioner claims that he was prejudiced by his counsel's failure to object to such evidence because, "[w]hile the first trial without this evidence led to a hung jury, the use of this evidence [in the second trial] led to a conviction." Pet'r's Reply Br. at 4.

"The touchstones for admissibility [of expert testimony] are two: reliability and relevancy." United States v. Crisp,

324 F.3d 261, 268 (4th Cir. 1993) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 597 (1993)). Federal Rule of Evidence 702 provides, in part, that an expert witness "may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue." Of course, the testimony must be "based on sufficient facts or data" and must be "the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Id.

Even without Petitioner's concession that the experts' testimony was relevant, the Court finds that the testimony was relevant to the question of whether Petitioner possessed the bag of cocaine. Federal Rule of Evidence 401 defines "relevant" as (1) having "any tendency to make a fact more or less probable" and (2) being "of consequence in determining the action." Certainly, the presence of Petitioner's fingerprints or DNA on the bag would make his possession of the bag more probable. Likewise, the absence of Petitioner's fingerprints or DNA on the bag, without the eyewitness testimony, would make the possession less probable. Responding to defense counsel's cross-examination of Officers Nunez and Morris, the Government introduced the experts' testimony to negate the inference that Petitioner's possession was less probable. See United States v.

16

Curtin, 489 F.3d 935, 940 (9th Cir. 2007) ("Federal courts repeatedly have held that the government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense."); United States v. Aranda, 963 F.2d 211, 215 (8th Cir. 1992) (holding that a "plea of not guilty places in issue every element of the crimes charged" and, moreover, that "it [is] not necessary for the government to await defendant's denial of [the elements] before introducing this evidence; the government may anticipate the defense and introduce it in its case-in-chief" (citations omitted)); United States v. Evans, 697 F.2d 240, 248 n.8 (8th Cir. 1983) (noting that it was not error for the court to admit evidence in its case-in-chief to rebut an anticipated defense). Thus, even if the absence of fingerprints and DNA did not resolve the ultimate question of Petitioner's possession, the experts' testimony was nonetheless probative of a fact "of consequence in determining the action." Fed. R. Ev. 401.

The experts' testimony was also reliable. Both experts, each of whom had been a forensic examiner for more than twenty years, had previously "been qualified as an expert witness in the field of forensic DNA analysis" and had received specialized and ongoing training in forensic analysis. Trial Tr. at 125. Moreover, "[f]ingerprint identification has been admissible as reliable evidence in criminal trials in this country since at

least 1911." Crisp, 324 F.3d at 266.[2]  There is no basis on which the Court or defense counsel could have concluded that the testimony of the expert witnesses was inadmissible.  Thus, because defense counsel could not have successfully objected to the experts' testimony on the ground that it was either unreliable or irrelevant, Petitioner fails to demonstrate that his lawyer made any errors regarding the expert witnesses, let alone "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.  Because Petitioner fails to satisfy the burden of proving the first prong of the Strickland test, the Court need not address the second prong.  Roane, 378 F.3d at 404.

### Officers' Testimony Regarding Lack of Forensic Evidence

Petitioner also claims that his counsel should have objected to the officers' testimony explaining the lack of fingerprint and DNA evidence because their testimony "anticipat[ed] an issue not affirmatively raised, specifically closing arguments by defense." Pet'r's Br. at 5.  Petitioner appears to argue that this testimony should have been presented only in rebuttal to evidence presented by the defense regarding

---

[2] See also United States v. Abreu, 406 F.3d 1304, 1307 (11th Cir. 2005) (holding that fingerprint evidence satisfies Daubert); United States v. Collins, 340 F.3d 672, 682-83 (8th Cir. 2003) (same); United States v. Havvard, 260 F.3d 597, 601 (7th Cir. 2001) (same); United States v. Sherwood, 98 F.3d 402, 408 (9th Cir. 1996) (same).

the absence of fingerprint and DNA evidence. <u>See</u> Pet'r's Reply Br. at 5.

Here, presumably anticipating Petitioner's theory of the case presented in the first trial – that "there's no fingerprint evidence in this case. There's no DNA evidence in this case linking the drugs, the packaging to [Petitioner] at all," Closing Statement Tr. at 23 (Jan. 24-25, 2008) – the Government introduced the officers' testimony regarding the lack of forensic evidence to negate any inference that Petitioner's possession was less probable. <u>See</u> <u>United States v. Foster</u>, 623 F.3d 605, 606-07 (8th Cir. 2010) (noting that, although "it is not common for the government to anticipate in its case-in-chief a defendant's theory of defense," the government "had had a preview of [defendant's] theory of the case in a previous proceeding that had ended in a mistrial"). The Government was not required to wait for Defendant to affirmatively introduce evidence or testimony on his behalf before "rebutting" Petitioner's theory. Furthermore, because the absence of forensic evidence "proved ultimately relevant," <u>id.</u>, the Court sees no basis for excluding the officers' testimony, such as "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Ev. 403. Thus, defense counsel did not err in failing to object to the officers' testimony regarding their

reasons for not submitting the bag for forensic testing. Because Petitioner fails to satisfy the burden of proving the first prong of the Strickland test, the Court need not address the second prong. Roane, 378 F.3d at 404.

### Improper Bolstering/Vouching

Petitioner also claims that his counsel should have objected to Officer Morris's testimony, which Petitioner alleges improperly vouched for, or bolstered, the testimony of Officer Nunez regarding whether or not he lost sight of the bag allegedly thrown by Petitioner. Petitioner alleges that Officer Nunez's testimony "carried with it an implied opinion that it was an actual fact that [Petitioner] possessed drugs," a fact that "was at the heart of the jury's determinations." Pet'r's Br. at 7.

Petitioner relies on United States v. Lewis, 10 F.3d 1086 (4th Cir. 1993), which stated that bolstering "generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." Lewis, 10 F.3d at 1089. "While improper [bolstering] must generally come from the prosecutor's own mouth, a prosecutor's solicitation of assertions of trustworthiness from government witnesses may also be impermissible." Id.

Here, prosecutor Norris[3] made no indication of her "personal belief in the credibility of [Officer Nunez]," nor did she solicit any "assertions of trustworthiness from [Officer Morris]" regarding Officer Nunez's testimony. <u>Id.</u> The prosecutor simply asked Officer Morris why the bag was not submitted for forensic testing. Thus, Petitioner fails to satisfy the first prong of <u>Strickland</u> with respect to Officer Morris's testimony, because defense counsel could not have reasonably objected to it. Accordingly, Petitioner's first claim is denied.

## B. Failure to Object to Alleged Prosecutorial Misconduct

Petitioner asserts that prosecutor Bradenham "committed Prosecutorial Misconduct . . . under the guise of artful cross-examination" and "during his rebuttal closing argument," which "struck at the very heart of the presumption of innocence . . . and denied [Petitioner] of [a fair trial]." Pet'r's Br. at 10, 11. Petitioner's second claim in his § 2255 motion thus alleges that his counsel was ineffective for (1) "failing to object to [the prosecutor's] cross-examination;" and (2) "fail[ing] to object to any aspect of [the prosecutor's] egregious[] closing argument." <u>Id.</u> at 10, 14.

To qualify as prosecutorial misconduct, a prosecutor's conduct must have "so infected the trial with unfairness as to

---

[3] The Government was represented at trial by two prosecutors, Assistant United States Attorney Robert E. Bradenham II and Special Assistant United States Attorney Jessica Norris.

make the resulting conviction a denial of due process." United States v. Scheetz, 293 F.3d 175, 185-86 (4th Cir. 2002) (quoting United States v. Morsley, 64 F.3d 907, 913 (4th Cir. 1995)). "The test for reversible prosecutorial misconduct has two components; first, the defendant must show that the prosecutor's remarks or conduct were improper and, second, the defendant must show that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." Id. (citing United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)). "An assessment of prejudice requires the court to consider:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.

United States v. Wilson, 624 F.3d 640, 656-57 (4th Cir. 2010) (citing Scheetz, 293 F.3d at 186).

### Cross-Examination of Petitioner

Petitioner assigns error to four questions that the prosecutor asked him on cross-examination, alleging that the questions "over step the bounds of 'Propriety and Fairness' as announced by the Supreme Court in Berger v. United States, 295

22

U.S. 78, 84 (1935)."   Pet'r's Br. at 9.   The line of questioning
that Petitioner characterizes as improper are as follows:

> Q: [The officer] asked you to put your hands on the
> vehicle, and you knew from your prior experience the
> next step was going to be to search you?
>
> A: To arrest me.
>
> Q: And that's when it came to your mind that if you
> were carrying anything on you, it would be found out
> at that time, right?
>
> A: I wasn't carrying anything.
>
> Q: If you were carrying something, you would have been
> found out at the time once he searched you, right?
>
> A: Never thought about it.
>
> Q: And once you ran, once you ran, you realized that
> if you were able to elude the police officer, that you
> could get away with $3,400 in drugs, right, assuming
> you were carrying these drugs?"
>
> A: I never even thought about it.
>
> . . .
>
> Q: The police officer testified he was right behind
> you when you tried to dispose of this bag of crack and
> powder cocaine, that actually hit him he was so close
> to you.   Do you recall him saying that?
>
> A: Yes, sir.
>
> Q: Assuming that is correct, you realize at that
> particular time that you had to separate yourself from
> the crack cocaine and powder cocaine that you were
> carrying, assuming that you were carrying, assuming
> you were carrying it in the first place?
>
> A:   I can't assume because I wasn't even thinking on
> that level.

Trial Tr. at 209-10.

Here, the prosecutor's line of questioning did not overstep the bounds of "propriety and fairness," as Petitioner contends. In Berger, the Supreme Court found that the prosecutor

> was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner.

295 U.S. 78, 84 (1935). The prosecutor's questioning of Petitioner, although vigorous, was not "bullying" or "indecorous and improper." Id. Nor did it misstate the facts, "put into the mouth[] of [Petitioner] things which [he] had not said," or hint at statements made to the prosecutor outside the courtroom. Id. Rather, the prosecutor cross-examined Petitioner regarding inferences reasonably and readily drawn from other testimony already in evidence. Furthermore, although the prosecutor did ask leading questions, Federal Rule of Evidence 611(c) permits "the court [to] allow leading questions . . . on cross-examination." In short, regardless of whether the prosecutor simply wished to emphasize for the jury the conflict between Petitioner's and the officers' testimony, or impeach him by eliciting contradictory statements, the prosecutor's questions

24

were not improper, but were instead a permissible and logical step in presenting the Government's case to the jury.   To be sure, Berger itself observes that a prosecutor "may prosecute with earnestness and vigor — indeed, he should do so."   Berger, 295 U.S. at 88.

In any event, the prosecutor's cross-examination of Petitioner does not appear to have caused Petitioner any prejudice.   Petitioner only objects to four "isolated" questions, which amount to less than one of ten pages of the transcript of the prosecutor's cross-examination.   Wilson, 624 F.3d at 656-57.   Nothing in the record suggests that the questions "were deliberately placed before the jury to divert attention to extraneous matters," or that they were asked in order "to mislead the jury and to prejudice the accused."   Id. Furthermore, the "strength of competent proof introduced to establish the guilt of the accused" was great, id., as the officers presented credible eyewitness testimony regarding the traffic stop, the chase, and the recovery of the narcotics.   In sum, the questions were not improper and, even if so, Petitioner cannot show that they prejudiced him.   Accordingly, the Court concludes that defense counsel was not ineffective for failing to object to the questioning as prosecutorial misconduct.

## Prosecutor's Rebuttal Closing Argument

Petitioner also assigns error to the prosecutor's rebuttal closing statement, in which he allegedly (1) developed a new argument, (2) misrepresented defense counsel's arguments, and (3) misstated the law. See Pet'r's Br. at 11. Thus, Petitioner claims in his § 2255 motion that his counsel's "failure to object to any aspect of [the prosecutor's] egregious[] closing argument was objectively unreasonable." Id. at 14.

"During closing argument, the government is permitted to draw reasonable inferences from the evidence adduced during the trial." United States v. Jones, 533 F. App'x 291, 298 (4th Cir. 2013) (citing United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994) (per curiam)). However, the prosecutor must follow the "fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." United States v. Lighty, 616 F.3d 321, 361 (4th Cir. 2010) (internal quotation marks omitted).

## Introduction of New Argument and Misrepresentation of Defense Argument

Petitioner claims that the prosecutor developed a novel argument and misrepresented defense counsel's argument during his rebuttal closing argument, to which defense counsel should have objected. In closing argument, defense counsel reminded the jury "that the crux of this case really came down to what happened during that chase" and identified "the dispositive

question" as "whether the government has proven beyond a reasonable doubt that [Petitioner] during the chase removed the bag of drugs and threw it."   Trial Tr. at 240.   "Basically," defense counsel argued, "it's Officer Nunez's word against [Petitioner's] word."   Id. at 241.   Defense counsel continued, "I'm not suggesting or [Petitioner] is not suggesting that Officer Nunez was driving around with a bag of drugs waiting for an opportunity to plant it on somebody."   Id.   Then, defense counsel stated, "I don't think I'm asking you to make a leap of faith, that during the chase Officer Nunez saw this bag and assumed because Mr. Rooks ran, that they were his."   Id. at 242. Petitioner assigns error to the following responsive statements made by the prosecutor during rebuttal argument:

> [Regarding the credibility of Officer Nunez,] what motive does Officer Nunez have to – and come down to it, if you believe what [defense counsel] wants you to believe, that the police officer was carrying around $3,400 worth of drugs in his pocket, ready to plant that on someone when given the opportunity.   That's what he's actually telling you. . . . The only way that you can acquit [Petitioner] in this is to conclude that the Newport News police planted those drugs on him.   That is the only issue for you to decide today.   I submit for him to be acquitted, these drugs had to be planted by Officer Nunez.   I submit that's preposterous.

Id. at 252-53.

Not only does Petitioner fail to demonstrate inadequate performance or prejudice under Strickland, but he fails to show that the prosecutor developed a new argument at all in his

rebuttal argument. Petitioner claims that the prosecutor introduced a "planted evidence argument" for the first time during his rebuttal. Pet'r's Br. at 12. However, the record shows that, during cross-examination of Petitioner, the prosecutor asked if Petitioner had "ever seen other police officers carry around $3,400 in drugs so they [could] plant them on individuals that they catch." Trial Tr. at 212. Petitioner replied, "I don't know what the police do." Id. Defense counsel addressed the "planted evidence argument" in his own closing when he stated: "I'm not suggesting . . . that Officer Nunez was driving around with a bag of drugs waiting for an opportunity to plant it on somebody." Id. at 241. However, defense counsel did not unequivocally disclaim the possibility that the drugs could have been planted, as well as that some other drug possessor could have coincidentally dropped the bag in exactly the same place as the officer ran while pursuing Petitioner. Id. Although the prosecutor could have also addressed the possibility that another drug possessor had dropped the drugs in the officer's path, his statements spoke directly to defense counsel's argument that the drugs did not belong to Petitioner and must have been placed there by someone else. Thus, the prosecutor's assertion on rebuttal — that "[t]he only way [the jury could] acquit [Petitioner] in this case is to conclude that the Newport News police planted those

28

drugs on him" — simply attempted to refute one of the inferences the jury might fairly have drawn from the defense's closing arguments. Id. at 253. See Jones, 533 F. App'x at 298.

Furthermore, even if the prosecutor's statement was made in error, "curative instructions were given to the jury." Wilson, 624 F.3d at 657. The Court instructed the jury that "[s]tatements and arguments of counsel are not evidence in the case, unless made as an admission or stipulation of fact." Trial Tr. at 218. At the beginning of his rebuttal argument, the prosecutor reminded the jury, "One of the most important instructions that the judge read to you is that the arguments and statements of lawyers is not evidence; is not evidence. The evidence comes from the witness stand and what's been published and what you can see and hear on that." Id. at 250. Thus, it is clear that the "prosecutor's remarks [did not] have a tendency to mislead the jury and to prejudice the accused." Wilson, 624 F.3d at 656. And, as stated above, "absent the remarks, . . . competent proof [was] introduced to establish the guilt of [Petitioner]." Id. Because Petitioner fails to show either "that the prosecutor's remarks or conduct were improper" or "that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial," Scheetz, 293 F.3d at 185–86, the Court concludes that defense counsel was not ineffective for failing to object and argue that

the prosecutor's closing argument amounted to prosecutorial
misconduct.

### Misstatement of the Law

Petitioner alleges that the prosecutor "misstated the law"
when he stated that "[t]he only way you can acquit [Petitioner]
. . . is to conclude that the Newport News police planted those
drugs on him." Trial Tr. at 253. However, the prosecutor was
not stating the law. Rather, as discussed above, the prosecutor
simply attempted to negate one of the potential inferences
raised by defense counsel's argument and focus the jury's
attention toward the weakness of such argument. In any event,
the jury was properly instructed regarding the law of the case.
Moreover, the judge instructed the jury that, if "any difference
appears to you between the law as stated by the lawyers and that
as stated by [the] Court in these instructions, of course, you
are to be governed by these instructions." Id. at 216. The
judge added that "[s]tatements and arguments of counsel are not
evidence in the case." Id. at 218. Thus, even if the
prosecutor had, in fact, made a misleading statement of the law
during rebuttal, the clear, valid instructions of the Court
cured any potential prejudice to Petitioner. Wilson, 624 F.3d
at 657; see also United States v. Horne, No. 91-5675, 1993 U.S.
App. LEXIS 6406, at *8 (4th Cir. Mar. 25, 1993) ("Curative jury
instructions can cure possible prejudice to a defendant from an

improper closing argument." (citing United States v. Elmore, 423 F.2d 775, 781-82 (4th Cir. 1970))). Because the Court concludes that the statements of the prosecutor during rebuttal did not amount to prosecutorial misconduct, and, in any event, even if they did amount to prosecutorial misconduct, Petitioner was not prejudiced, the Court finds that defense counsel was not ineffective for declining to object to those statements. Accordingly, Petitioner's second claim is denied.

### C. Failure to Object to Alleged Court Errors

Petitioner's third claim is that defense counsel was ineffective for failing to object to certain alleged errors by the Court during trial and sentencing, namely, (1) "improper jury instructions," and (2) "Verdict form." Pet'r's Mot. at 8. Petitioner also asserts that his counsel "failed to argue for a lower sentence based on the disparity between crack and powder, even though [he] was a career offender." Id.

### Jury Instruction

Petitioner assigns error to the Court's jury instruction that the Government must prove, among the other elements of the crime, that Petitioner "possessed in excess of five grams of cocaine base." Trial Tr. at 226. Thus, Petitioner argues that his counsel was ineffective for failing to object to the Court's jury instruction "that a specific drug quantity was an element of 21 U.S.C. § 841(a)." Pet'r's Br. at 16. However, the Fourth

Circuit has held that drug quantity is an element under § 841, see United States v. Promise, 255 F.3d 150, 156-57 (4th Cir. 2001) (en banc) (holding that "specific threshold drug quantities must be treated as elements . . . rather than as mere sentencing factors"). Here, the Indictment specifically charged Petitioner with possessing "in excess of 5 grams of . . . cocaine base," in violation of § 841(a)(1) and (b)(1)(B). Thus, a finding of a specific drug weight was an essential statutory element of the violation that the Government was required to prove in order to obtain a conviction. Defense counsel was not ineffective for not objecting to a proper jury instruction, and therefore the Court does not need to address Petitioner's claim that he was prejudiced by counsel's "failure" to raise such an objection.

## Verdict Form

Petitioner also argues that his counsel erred by failing to object to the special verdict form, which directed the jury, if it found Petitioner guilty, to select the weight it determined that Petitioner had possessed, because the verdict form "related to the [Sentencing Guidelines] and had nothing to do with determining what sentencing scheme of § 841(b) applied." Pet'r's Br. at 18. He claims that "[a] proper [special] verdict form would have permitted the jury to find a reduced drug quantity leading to a reduced statutory sentence." Id. at 18.

32

Upon a careful review of the record, the Court finds that the special verdict form was not improper in any way. Nor does the Court agree that the inclusion of a "graduated penalty scheme[]," id. at 19, on the verdict form would have led to a reduced penalty. The jury considered the special verdict form only after it had already concluded that Petitioner was guilty of the offense charged in the Indictment, namely, that he had possessed with the intent to distribute more than five grams of cocaine base.[4]   Moreover, Petitioner's claim of prejudice resulting from this alleged error — and counsel's alleged failure to object — fails because, once Petitioner was classified as a career offender, the possibility of his receiving a sentence below 360 months evaporated. The trial judge raised the point directly with defense counsel, stating "There was an objection to drug weights. I think, [counsel], it doesn't really matter in this particular case because of the career offender [designation]." Sentencing Tr. at 44. Defense counsel responded, "Judge, in leiu [sic] of the finding that he's a career offender, I think not. There was the special finding by the jury that basically put him in a specific

---

[4] With respect to the special verdict form, the Court instructed the jury: "If you find that he's guilty, however - it's pretty clear. It tells you what to do. But it also requires that you find that if he is guilty, to check various drug weights. It just says at least 5 grams but less than 20 grams, at least 20 grams but less than 35 grams, at least 35 grams but less than 50 grams. <u>So if you find him not guilty, you don't fill out that particular form of the verdict form. If you find him guilty, then you have to check one of those.</u>" Trial Tr. at 255 (emphasis added).

category as far as drug weight is concerned." Id. at 45. Thus, even if defense counsel should have objected to the verdict form, any error was harmless, due to Petitioner's career offender status.

### Crack/Powder Disparity in Sentencing

Petitioner asserts that his counsel was ineffective for failing to "raise the disparity between Crack/Powder during his sentence [hearing]" in light of the Supreme Court's decision in Kimbrough v. United States, 552 U.S. 85 (2007), which held that a court could conclude "that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes." Id. at 110.

Here, even though defense counsel did not specifically address Kimbrough at the sentencing hearing, he vigorously argued to the Court that a "guideline range of basically 30 years to life is a sentence significantly greater than what is necessary to comply with the sentencing factors set forth in Title 18, United States Code, Section 3553(a)." Sentencing Tr. at 54. Acknowledging that "the maximum penalty that the Court could impose is life imprisonment," defense counsel requested "a sentence below the advisory guideline range." Id. at 55. Considering "the facts and circumstances of the offense, the quantity involved, counsel contended that, "even with [Petitioner's] record," this case is not one "that merits life

in prison." Id.  In fact, counsel continued, "giving this man 30 years, much less life, would lead to great disparity as far as that factor of unwarranted sentencing disparity is concerned." Id. at 56.  After hearing argument by both counsel, the Court reviewed the 3553(a) factors as they pertained to Petitioner's case.  The Court stated that it had carefully considered "all the factors in 3553" and "the Kimbrough case," id. at 66, and sentenced Petitioner to 360 months imprisonment, a sentence at the low end of the advisory guideline range. After rendering the sentence, the Court stated, "I have already indicated why I think this sentence is fair.  But I do believe that considering his entire history that this is sufficient, but not greater than necessary, to meet the goals of 3553(a)." Id. Thus, the Court finds that defense counsel vigorously advocated on Petitioner's behalf for a lesser sentence, in light of the 3553(a) factors, and that the Court carefully considered those factors, as well as Kimbrough, when determining the appropriate sentence.  Petitioner therefore fails to show that defense counsel's assistance was deficient or that he was prejudiced by any perceived failure by defense counsel; accordingly, Petitioner's third claim fails to satisfy either prong of the Strickland test.  Accordingly, Petitioner's third claim is denied.

### D. Alleged Ineffective Assistance of Appellate Counsel

Petitioner's fourth and final claim consists of a single sentence in his § 2255 motion. Petitioner asserts that his appellate attorney was ineffective for failing to argue "all of the substantive claims underlying each instance of ineffective assistance of counsel argued herein" — in other words, those claims raised now in Petitioner's § 2255 Motion. Pet'r's Mot. at 9. As established in the foregoing paragraphs, Petitioner's "substantive claims" are meritless, thus establishing that Petitioner's appellate counsel was under no obligation to raise his claims on direct appeal. As such, Petitioner fails to demonstrate that his appellate counsel provided ineffective assistance. Accordingly, Petitioner's fourth claim is denied.

### IV. CONCLUSION

For all of the reasons discussed above, Petitioner's § 2255 motion is **DENIED.** Petitioner plainly fails to demonstrate either that defense counsel provided constitutionally deficient performance or that he was prejudiced by counsel's performance.

Finding that Petitioner has not made a "substantial showing of the denial of a constitutional right," a certificate of appealability as to Petitioner's § 2255 motion is **DENIED.** R. Governing § 2255 Proceedings in U.S. Dist. Cts. 11(a); 28 U.S.C. § 2253(c)(2); see <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003).

Petitioner is **ADVISED** that, because a certificate of appealability is denied by this Court, he may seek a certificate from the United States Court of Appeals for the Fourth Circuit. R. Gov. § 2255 Proceedings for U.S. Dist. Cts. 11(a). If Petitioner intends to seek a certificate of appealability from the Court of Appeals, he must forward a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia, 23510, within sixty (60) days from the date of this Order.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to Petitioner and the United States Attorney's Office in Newport News, Virginia.

**IT IS SO ORDERED.**

/s/ _____

_____
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March 11 , 2014